## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Grayson & Associates, P.C.
Eric D. Grayson, Esq. (EDG 5056)
124 West Putnam Avenue, Second Floor
Greenwich, Connecticut 06830
(203) 622-8100
Attorneys for Defendant
_____x
KUDAN RICE MILLS, LTD.

        Plaintiff,                08 Civ. 3699 (DLC)

    v.

JLM INTERNATIONAL, INC.           April 29, 2008

        Defendant.
_____x

## DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION UNDER ADMIRALTY RULE E(4)(f) TO VACATE THE ATTACHMENTS

Defendant JLM International, Inc. submits this brief to supplement its letter brief dated April 28, 2008, requesting that the Ex Parte Maritime Rule B Attachment in the amount of $554,372.20 be vacated for lack of maritime jurisdiction and no probable cause.

We note at the outset while;

"[t]he precise categorization of the contracts that warrant invocation of the federal courts' admiralty jurisdiction has proven particularly elusive," the abiding instruction of the Supreme Court is that we should look to the contract's "nature and character" to see "whether it has 'reference to maritime service or maritime transactions,'" *Norfolk S. Ry. Co.,* 125 S.Ct. at 393 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 63 L.Ed. 510 (1919)); *see Dunham,* 78 U.S. (11 Wall.) at 26. Therefore, the contract's subject matter must be our focal point. *See, e.g., Exxon Corp.,* 500 U.S. at 611, 111 S.Ct. 2071; *Dunham,* 78 U.S. (11 Wall.) at 29.

Folksamerica Reinsurance Co. v. Clean Water of New York, Inc., 413 F.3d 307, 312 (2d Cir. 2005)

As is noted in *Benedict on Admiralty,* to have "maritime character," "there must be present

a direct and proximate judicial link between the contract and the operation of the ship, its navigation or its management afloat." *Benedict on Admiralty* §§ 182, at 11-7 (7th ed.1985).

In this case it is undisputed that JLM was nothing more than a FOB seller, meaning that it was not involved with arranging for the ship at all - -that was Kudan's responsibility. All JLM had to do was deliver the goods to the dock - - all of the shipping arrangements were between Kudan and the shipowner. Furthermore, it was not even up to JLM to accept the vessel, it was up to the supplier, the Spanish company Repsol, who can veto ships that are not approved by the Spanish government, because for example, they have poor safety records, are not fitted with the latest anti-pollution components or may be unsuitable, i.e., too big for the berth. However, the suitability of the ship is again between Kudan, who chartered the ship, the ship owner and Repsol. If Kudan chartered the wrong type of vessel, that is its problem. JLM did what it was supposed to - - have a cargo ready for delivery to Kudan's vessel, assuming it could find one. This was a phenol sales contract, not a maritime contract.

The case cited in Ms. Peterson's letter to the Court dated April 28, 2008, Brave Bulk Trasp. v. Spot on Shipping, Ltd., 2007 WL 3255823, 2007 AMC 2958 (SDNY 2007) does nothing more than highlight the undisputed factual and legal conclusion that the Kudan/JLM contract was a non-maritime contract. Brave Bulk involved a future contracts to secure ships at certain rates, for certain times, and for agreed tonnages. The parties involved were "shipowners" "charters" and /or "traders." The future contracts had nothing to do with the purchase and sale of goods. In the JLM contract, there was no ship owner or charterer, as Kudan had to arrange a separate charter with a shipowner who was a stranger to the JLM agreement. As Judge McMahon described in Brave Bulk:

> "Forward freight agreements, or FFAs as they are commonly known, are commitments to perform in the future a **shipping service between ship owners, charterers and/or traders.** The parties to the agreement contract to "pay the difference between a price agreed today and the future price of moving a product from one location to another, or for the future price of hiring a ship over a period of time." Adam Sonin, *Managing Risk with Forward Freight Agreements, Commodities Now*, June 2005, *available online at:* http:// www.commodities-now.com/content/market-areas/ags-and-softs/ ma-article-7.pdf? PHPSESSID=34967b.

2

> **In the shipping industry, FFAs are negotiated with the express purpose of hedging and managing market risks relating to the employment of vessels in today's volatile freight market. For example, in the instant FFA, the parties entered into a Forward Freight Agreement to buy and sell a specified tonnage freight at an agreed price for an agreed route and time span so that both corporations could reliably predict their ocean freight revenues and costs for the duration of the contract for those ocean routes.** Thus, Forward Freight Agreements can fairly be said to constitute maritime contracts.

Brave Bulk Transport Ltd. v. Spot On Shipping Ltd., 2007 WL 3255823, 2 (S.D.N.Y.,2007)

At this juncture, we would like to adopt and incorporate herein the Legal Argument of Star Grain Ltd.'s brief filed in Aston, which was signed by **Nancy Peterson, Esq.,** - - **the same attorney who appears on the Verified Complaint in this matter.** (The Brief is attached as Ex. A hereto).[1] In the Aston case, Aston was the seller of the grain which was sold under CIF terms, meaning that Aston had to charter in the ship, load it and then deliver it to Egypt, where Star was to take delivery. The contract was far more maritime in nature than the JLM contract, since it was part of the seller's obligation to provide a ship and the parties included in the contract provisions for shipment conditions relating to the vessel's condition/holds, vessel discharge rates and demurrage.[2] Demurrage is a pure maritime concept, as it involves who pays for the ship's waiting time, if the ship cannot get into berth. Importantly, it was not the sale aspects that were involved in Aston but the maritime concept of demurrage. And despite this fact, Star Grain/Ms. Peterson argued that this was a non-maritime contract and the Court agreed.

In the JLM contract, JLM was merely the seller of the phenol and had no maritime obligations at all. Because the phenol was sold FOB, Kudan had to charter the ship and any

---

[1]  The Brief was submitted by a predecessor firm of Lennon Murphy & Lennon.

[2]  A copy of the contract is attached as Ex. B

3

maritime issues were between it and the ship owner.

In representing to the Court that Aston-Star Grain contract was non-maritime, Ms. Peterson

wrote as follows:

> "An original non-maritime contract of purchase and sale does not become maritime merely
> because the contract includes a demurrage provision. See French Republic v. Fahey et al,
> 278 F. 947, 949 (D. Md 1922) (indicating that a non-maritime contact of purchase and sale
> does not become maritime merely because one of the parties may be entitled to recover
> demurrage damages).  Whatever may be the relative rights of the parties to collect
> demurrage, Star Grain was merely a buyer of merchandise and there was nothing maritime
> about the bargain it made with Aston. Id.

> Star's liability to Aston for demurrage is incidental to the sale contracts as a whole.  See
> Woodcraft Works, Ltd. V. The US, 139 Ct. Cl 149 (July 12, 1957) (holding that a contract
> to furnish lumber, by which defendant owed demurrage to plaintiff, was not a maritime
> contract).  While an action by the owner of a transporting ship for demurrage could be
> maritime claim, an action by the shipper against the consignee is not.[3]

> The charter parties entered into with the Owners to ship the wheat are independent from the
> purchase and sale contracts Aston entered into with Star Grain to sell the wheat.  Thus while
> an action by the Owners to recover demurrage pursuant (to) the charter parties could be
> maritime, an action by Aston, acting as seller, to recover damages pursuant to the purchase
> and sale contracts is certainly not.  Any liability Star Grain could have in regards to Aston
> is under the purchase and sale contracts, not the charter parties.

> In sum, in the instant case a seller of wheat (Aston) is attempting to recover damages from
> the buyer of wheat (Star Grain) as there were problems with delivery.  The fact that the
> delivery happened to take place on a ship is completely incidental to the purpose of the
> contract, namely the sale of the wheat." (Star/Peterson's Brief at 6)

In our case, there is not even a demurrage/maritime claim - - the claim is that JLM for some

reason failed to accept Kudan's vessel and load. The issue is therefore a failure to tender delivery.

First of all, it was not up to JLM to accept the vessel, it was up to the supplier, Repsol, who controls

---

[3] In our case of course JLM was only the seller of the phenol, as Kudan was the actual
shipper and consignee.

the dock. However vessel suitability is between Kudan, who chartered the ship, the ship owner and

Repsol. If Kudan chartered the wrong type of vessel, that is its problem. JLM did what it was

supposed to - - have a cargo ready for delivery to Kudan's vessel, assuming it could find one. To

paraphrase Ms. Peterson in the Aston case:

> In sum, in the instant case a buyer of phenol (Kudan) is attempting to recover damages from
> the seller of phenol (JLM) as there were problems with delivery (to a ship under Kudan's
> control). The fact that the delivery happened to take place on a ship is completely incidental
> to the purpose of the contract, namely the sale of the phenol.

## CONCLUSION

Based on the foregoing, the settled case law and the exhibits submitted herein, it is

respectfully requested that the Court vacate the attachment as respectfully this is not a maritime

contract and thus the Court does not have admiralty jurisdiction.

Dated: April 29, 2008

Grayson & Associates, P.C.
Eric D. Grayson, Esq. (EDG 5056)
124 West Putnam Avenue, Second Floor
Greenwich, Connecticut 06830
(203) 622-8100
Attorneys for Plaintiff

5

Certificate of Service

I hereby certify that a copy of the attached was served by the Court's ECF service on all appropriate parties and by first class mail, postage prepaid on April 29, 2008, on those parties to whom ECF filing in not available.

Eric D. Grayson

Service on:

Kevin Lennon, Esq.
Nancy Peterson, Esq.
Lennon Murphy & Lennon, LLC
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
ASTON AGRO-INDUSTRIAL AG,    :

       Plaintiff,    :    06 Civ. 2805 (GBD)

   -against-    :

STAR GRAIN LTD.,    :

       Defendant.    :
------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT'S MOTION TO VACATE THE ATTACHMENT

Defendant, Star Grain Ltd. (hereinafter "Star Grain" or "Defendant"), by and through its

undersigned counsel, Tisdale & Lennon, LLC, respectfully submits this Memorandum of Law in

Support of its Motion to Vacate the Maritime Attachment issued pursuant to Rule B of the

Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil

Procedure ("Rule B"). As Plaintiff, Aston Agro-Industrial AG (hereinafter "Aston" or

"Plaintiff") has failed to allege a recognizable claim in admiralty as required under Rule B, Star

Grain's motion should be granted and the attachment vacated for lack of subject matter

jurisdiction.

## FACTS

Plaintiff Aston was, and still is, a business entity duly organized under foreign law with

an address at Charmerstrasse 14, 6300 Zug, Switzerland. Defendant Star Grain is a business

entity organized under the laws of a foreign country with an address at 48 Elnasr St., Maadi,

Cairo, Egypt.

The underlying dispute arises from Aston's claim that Star Grain has breached two

separate purchase and sale contracts. *See Plaintiff's Verified Complaint, at ¶ 4.* However, the

Exhibit A

contracts are not directly and intimately related to the operation of a vessel or its navigation, i.e., they are not maritime in nature. Specifically, Aston and Star Grain entered into two purchase and sale contracts by which Star Grain purchased a quantity of Russian wheat from Aston. Star Grain agreed to take delivery of the wheat at Dakheila, Egypt. The first contract (no. 496) was dated August 4, 2003, and the second contract (no. 498) was dated August 14, 2003. *See Contract no. 496 and Contract no. 498 annexed to the Declaration of Nancy R. Peterson as Exhibits "1" and "2" respectively.* The contracts provided for delivery of the wheat by ship, and included a demurrage clause. Upon information and belief, Aston then entered into charter parties with the owners of the M/V SIRIUS and the M/V ALENA (hereinafter the "Owners") in order to ship the wheat to Egypt. The first shipment of wheat was transported aboard the M/V SIRIUS and the second was transported aboard the M/V ALENA (hereinafter referred to as the "Vessels.")

Due to possible water damage to the cargo, Aston has alleged that the buyers of the wheat would not discharge the cargoes or release the ships until they had received full payment for the damage. Consequently, the vessels were allegedly held with cargo on board until they were released on October 1 and 11, respectively. As a result demurrage allegedly accrued. The Owners of the Vessels ultimately settled with Star Grain in regards to the damage caused to the wheat. In turn, the Owners of the Vessels released Star Grain from any claims that the Owners might bring for demurrage for the period, August 19, 2003 until the time of sailing. *See Releases annexed to the Declaration of Nancy Peterson as Exhibit "3."*

Star Grain has been given a release for demurrage claims by the Owners of the Vessels. However, Aston ignores this fact and seeks to recover demurrage damages from Star Grain that Aston allegedly owes to the Owners pursuant to independent charter party contracts.

2

The sale contracts provided that disputes be resolved by arbitration before GAFTA (the Grain and Feed Trade Association), and both parties, represented by counsel, arbitrated their dispute. An arbitration award was subsequently issued in Aston's favor. Star Grain appealed and a further award was issued in Aston's favor. *See Plaintiff's Verified Complaint at ¶¶8-10.*

On April 11, 2006, Plaintiff Aston applied for and obtained an ex parte maritime attachment order under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. At present, no funds have been restrained under the attachment. Star Grain makes the instant motion to vacate the attachment as Aston has failed to allege a maritime claim as required under Rule B.

## ARGUMENT

### THE ATTACHMENT SHOULD BE VACATED AS THERE IS NO ADMIRALTY JURISDICTION

**A. Rule B maritime attachment can be invoked only when admiralty jurisdiction exists over a maritime claim.**

Rule B maritime attachment can be invoked only when a plaintiff files a verified complaint sufficient to make a prima facie showing that the plaintiff has a valid maritime claim against the defendant in the amount sued for. *See Maritima Petroleo E Engenharia Ltda. v. Ocean Rig 1 AS and Ocean Rig 2 AS,* 78 F. Supp. 2d 162, 166 (S.D.N.Y. 1999) *citing* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law,* §21-2 at 471 (2d ed. 1999). Thus, a plaintiff seeking a maritime attachment order under Rule B must properly allege a maritime claim. "The absence of maritime jurisdiction would prove fatal to [a] plaintiff's attachment." *Maritime Petroleo,* 78 F. Supp. at 166. As will be shown herein, Aston has failed to make a prima facie showing that it has a valid maritime claim.

**B. The Plaintiff has the burden of establishing the federal court's subject matter jurisdiction over its claims.**

3

The Plaintiff bears the burden of establishing that the federal court has subject matter jurisdiction over its claims. As shown above, in Rule B cases a plaintiff necessarily relies on the admiralty jurisdiction of the federal court. Therefore, the plaintiff bears the burden of showing that it has a maritime claim.

Furthermore, the subject matter jurisdiction of the court must be affirmatively proved. The court may not infer subject matter jurisdiction. *See Shipping Financial Serv. Corp. v. Drakos,* 140 F.3d 129, 131 (2d. Cir. 1998)(stating that "when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."

Aston has alleged in ¶1 of its Verified Complaint that its claim falls within the admiralty jurisdiction of the court. However, Aston further indicates at ¶4 that its claim is based on the breach of two contracts of sale, by which Aston sold a quantities of wheat to Star Grain. Aston's allegations in ¶4 negates it allegation in ¶1 as a breach of a purchase contract for wheat, without more, will not support admiralty jurisdiction. As will be shown below, Aston has failed to make a prima facie showing that its claims against the Sun Grain are within the court's admiralty jurisdiction.

### C. Admiralty jurisdiction does not extend to contracts in which the maritime aspects are incidental to the purpose of the contract.

Admiralty jurisdiction is provided for under 28 U.S.C. §1333(1) which affords district courts original jurisdiction over "any civil case of admiralty or maritime jurisdiction." While the courts have found the boundaries of admiralty jurisdiction as based on maritime contracts difficult to draw, "[t]he United States Supreme Court has held that the 'true criterion' and

4

'crucial consideration' for determining admiralty jurisdiction is the 'nature and subject matter of the contract at issue.'" *See Sea Transport Contractors, Ltd. v. Industries Chemique Du Senegal,* 411 F. Supp. 2d 386, 393 (2006); *see also Kossick v. United Fruit CO,* 365 U.S. 731 (1961).

Furthermore, in general the "subject matter of the contract must be directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract relate in some preliminary (shore side) manner to maritime affairs." 1 *Shoenbaum* § 3010 at 111.

"Admiralty jurisdiction does not attach to a contract merely because the services to be performed under the contract have reference to a ship, or to its business, or that the ship is the object of such services or that it has reference to navigable waters." *See Intercontinental Contractors, Inc. v. Canadian Maritime Carriers, Ltd. and Maritime Port Services Division of Maritime Group (Canada) Inc.,* 1986 U.S. Dist. LEXIS 25872, at *2 (E.D.Penn. May 6, 1986) *citing* 1 *Benedict on Admiralty* § 183 (7th ed. 1985).

"In order to be considered maritime, there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping." 1-XII *Benedict on Admiralty* § 182 (2005).

Here, the subject matter of the contracts between Aston and Star Grain is the purchase of Russian Wheat. *See Exhibits "1" and "2" annexed to the Declaration of Nancy R. Peterson.* Neither Russian wheat nor the purchase thereof is directly and intimately related to the operation of a vessel or its navigation. However, Aston nevertheless maintains that a commodity sales contract is maritime in nature by the mere inclusion of a simple demurrage clause relating to the shipment of the commodity. This is not the case.

5

An original non-maritime contract of purchase and sale does not become maritime merely because the contract includes a demurrage provision. *See French Republic v. Fahey et al.* 278 F. 947, 949 (D.Md. 1922) (indicating that a non-maritime contract of purchase and sale does not become maritime merely because one of the parties may be entitled to recover demurrage damages). Whatever may be the relative rights of the parties to collect demurrage, Star Grain was merely a buyer of merchandise, and there was nothing maritime about the bargain it made with Aston. *See Id.*

Star Grain's liability to Aston for demurrage is incidental to the sale contracts as a whole. *See Woodcraft' Works, Ltd. v. The U.S.*, 139 Ct. Cl. 149 (July 12, 1957) (holding that a contract to furnish lumber, by which defendant owed demurrage to plaintiff, was not a maritime contract). While an action by the owner of a transporting ship for demurrage could be maritime claim, an action by the shipper against the consignee is certainly not. *See id.* The charter parties that Aston entered into with Owners to ship the wheat are independent from the purchase and sale contracts Aston entered into with Star Grain to sell the wheat. Thus, while an action by the Owners to recover demurrage pursuant the charter parties could be maritime, an action by Aston, acting as a seller, to recover damages pursuant to the purchase and sale contracts is certainly not. Any liability Star Grain could have in regards to Aston is under the purchase and sale contracts, not the charter parties.

In sum, in the instant case a seller of wheat (Aston) is attempting to recover damages from the buyer of wheat (Star Grain) as there were problems with delivery. The fact that the delivery happened to take place on a ship is completely incidental to the purpose of the contract, namely, the sale of the wheat.

6

As the contracts at issue are not directly and intimately related to the operation of a vessel and its navigation, they are not sufficiently maritime to come within maritime jurisdiction.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this Court grant Defendant Sun Grain Ltd.'s motion to vacate the attachment.

Dated: New York, NY
     June 1, 2006

                        The Defendant,
                        STAR GRAIN LTD.

            By:

                        Nancy R. Peterson (NP 2871)
                        Patrick F. Lennon (PL 2162)
                        TISDALE & LENNON, LLC
                        11 West 42nd Street, Suite 900
                        New York, NY 10036
                        (212) 354-0025 – phone
                        (212) 869-0067 – fax
                        npeterson@tisdale-lennon.com
                        plennon@tisdale-lennon.com

TO:    FREEHILL HOGAN & MAHAR LLP
        Attorneys for the Plaintiff
        Peter J. Gutowski (PG 2200)
        Lawrence J. Kahn (LK 5215)
        Aston Agro-Industrial AG
        80 Pine Street
        New York, NY 10005

19-03-2004  17:21   FROM-RAYFIE        3632396        +0191203000     T-567  P-001/01  F-001

CONTRACT N°496
04 AUGUST 2003

203 /xq

| BUYER | STAR GRAIN LTD |
| | ABACUS HOUSE, 4 ARTEMIDOS AVENUE |
| | CY6030, LARNACA, CYPRUS |
| SELLER | ASTON AGRO-INDUSTRIAL AG |
| | CHAMERSTRASSE 14 |
| | 6301 ZUG, SWITZERLAND |

COMMODITY   RUSSIAN WHEAT
QUANTITY    5,000 ± 10% AT SELLER'S OPTION AT CONTRACT PRICE
QUALITY     SPECIFICATIONS:

| PROTEIN | MIN | 12.0% |
|---|---|---|
| MOISTURE | MAX | 13.0% |
| TEST WEIGHT | MIN | 76 KGS/HL |
| W | MIN | 140 |
| HAGBERG | SECONDS | 190 |
| GLUTEN | MIN | 25.5 |
| FOREIGN MATTER | MAX | 2% |

FREE FROM LIVE INSECTS AND WEEVILS
FREE FROM COTTON SEEDS AND POISONOUS SEEDS
FREE FROM FOREIGN ODOURS AND IRON FILING.

PRICE     US$ 163.00/MT CIF FREE OUT 1 SB DAKHEILA, EGYPT
          US DOLLARS ONE HUNDRED SIXTY THREE ONLY

PAYMENT TERMS

1.  100% OF CONTRACT VALUE CALCULATED AT ACTUAL LOADED TONNAGE IS PAYABLE AGAINST PRESENTATION OF DOCUMENTS VIA BNP PARIS GENEVA BY FAX TO ARAB INTERNATIONAL BANK, TAHRIR BRANCH, ACCOMPANIED BY A CLAIM DRAWN ON BUYER, FAX N°+20 25 75 32 28.

2.  THE TRANSFER SHALL BE MADE BEFORE THE CLOSE OF BUSINESS NEXT WORKING DAY AFTER RECEIPT OF THE PAYMENT CLAIM.

3.  ORIGINAL DOCUMENTS WILL THEN BE AUTOMATICALLY FORWARDED TO BUYER THRU THE BANKING SYSTEM

9-03-04 28:06   TO:KAPO           FROM:+01312612444

Exhibit B

19-03-2004  17:22  FROM-RAYFII          3632396        +01912812444        7-357  P 0.17/030  F-391

CONTRACT N° 496
04 AUGUST 2003

## SHIPPING DOCUMENTS

SELLER SHALL PRESENT THE FOLLOWING SHIPPING DOCUMENTS FOR
COLLECTION VIA THE BANKING SYSTEM AT HIS COST:

1) COMMERCIAL INVOICE + 3 COPIES

2) CERTIFICATE OF ORIGIN ISSUED OR CERTIFIED BY THE CHAMBER
OF COMMERCE LEGALISED BY THE EGYPTIAN CONSULATE + COPY.

3) COMPLETE SET OF 3/3 BILLS OF LADING + 6 COPIES DULY
MARKED "CLEAN ON BOARD" AND "FREIGHT PREPAID" ISSUED TO
THE ORDER OF OPENING BANK, NOTIFY BUYER.

4) PHYTOSANITARY CERTIFICATE ISSUED BY A COMPETENT AUTHORITY
+ COPY

5) FUMIGATION CERTIFICATE + COPY

6) OFFICIAL NON-RADIATION CERTIFICATE STATING THAT RADIATION
OF SHIPPED CARGO IS WITHIN INTERNATIONAL PERMISSIBLE
LIMITS + COPY

7) CERTIFICATE OF HOLD CLEANLINESS + COPY

8) CERTIFICATE OF WEIGHT + COPY

9) CERTIFICATE OF QUALITY EVIDENCING ANALYSIS OF CARGO +
COPY

10) INSURANCE CERTIFICATE + COPY

## SPECIAL CONDITIONS

A. CHARTER PARTY BILLS OF LADING ARE ACCEPTABLE

B. THIRD PARTY DOCUMENTS ARE ACCEPTABLE EXCEPT INVOICE TO BE
ISSUED BY SELLER.

C. ALL IMPORT TAXES, DUTIES, AND LICENSES IN THE COUNTRY OF
DESTINATION SHALL BE AT BUYER'S RESPONSIBILITY AND COST.

## SHIPMENT CONDITIONS

SHIPMENT    IN ONE SPOT SHIPMENTS ETS 05 AUGUST 2003

VESSELS     CLASSIFIED, ISM CERTIFIED BULK CARRIER.

HOLDS       SHALL BE INSPECTED FOR CLEANLINESS BEFORE LOADING BY AN
INTERNATIONAL SURVEYING COMPANY AT SELLER'S OPTION AND
COST

PRE ADVICE  VESSEL SHALL SERVE THREE DAYS PRE-ADVICE FOR ARRIVAL AT
DISCHARGE PORT.

2

*2*

-03-04  20:06  TO:KAPO                    FROM:+01912812444        L.1.

CONTRACT N° 456
04 AUGUST 2003

| | |
|---|---|
| DISCHARGE | AT A UNIFORM RATE OF 1,000 MT/WWD OF 24 WORKING HOURS THUPM FHEX EIU. |
| TIME COUNT | NOR SHALL BE TENDERED AND ACCEPTED DURING OFFICIAL WORKING HOURS WIPON WIBON, WIBCON, WIFPON, LAYTIME TO COUNT AT 08:00H NEXT WORKING DAY AFTER SERVING VALID NOR. TIME SHALL NOT COUNT ON THURSDAY AND DAYS BEFORE HOLIDAYS AFTER 12:00 H UNTIL SATURDAY OR THE FIRST WORKING DAY AFTER THE HOLIDAY AT 08:00H. |
| LOI | IN CASE VESSEL ARRIVES AT DISCHARGE PORT BEFORE RECEIPT OF ORIGINAL DOCUMENTS; BUYER SHALL START DISCHARGE WITHOUT ANY DELAY BY ISSUING A LOI IN FAVOUR OF SHIP OWNERS IN ACCORDANCE WITH PANDI TEXT. |
| DEMURRAGE | THE CHARTER PARTY RATE FOR DEMURRAGE AND DISPATCH SHALL BE DECLARED UPON OFFICIAL VESSEL NOMINATION WITH FRACTIONS CALCULATED IN PROPORTION. POSSIBLE CLAIMS SHALL BE SETTLED WITHIN 14 DAYS FROM RECEIPT OF A CLAIM SUBSTANTIATED BY BOF AND CLAIMANT'S INVOICE. |

**GENERAL CONDITIONS**

| | |
|---|---|
| ORIGIN | RUSSIA |
| PACKING | IN BULK |
| INSURANCE | SELLER SHALL PROVIDE ALL RISKS INSURANCE AT HIS COST. |
| INSPECTION | QUALITY, WEIGHT, AND CONDITION OF WHEAT ARE FINAL AT THE TIME AND PLACE OF LOADING ACCORDING TO CERTIFICATES ISSUED BY AN INTERNATIONAL SURVEYING COMPANY AT SELLER'S OPTION AND COST. |
| FUMIGATION | SHALL BE EXECUTED BY A COMPETENT AUTHORITY AND SHALL BE FINAL AT PORT OF LOADING BY ALUMINIUM PHOSPHIDE AT SELLER'S COST. |
| RADIATION | THE NON-RADIATION CERTIFICATE SHALL BE AN OFFICIAL CERTIFICATE EVIDENCING LEVEL OF RADIATION WITHIN ACCEPTABLE INTERNATIONAL NORMS. |
| RULES | ALL ITEMS NOT IN CONFLICT WITH THE ABOVE ARE SUBJECT TO GAFTA CONTRACTS N° 49 |

3

CONTRACT N°496
04 AUGUST 2003

ARBITRATION  ALL DISPUTES ARISING FROM THIS CONTRACT WILL BE RESOLVED
AMICABLY BETWEEN BUYER AND SELLER. IN CASE OF FAILURE,
SUCH DISPUTES SHALL BE REFERRED TO ARBITRATION IN LONDON
IN ACCORDANCE WITH GAFTA N°125 OF WHICH BOTH PARTIES
ADMIT TO HAVE KNOWLEDGE AND HEREBY ACCEPT.

ON THIS DAY THIS CONTRACT WAS SIGNED OVER THE HANDS OF RESPONSIBLE
OFFICERS FROM BUYER AND SELLER
BUYER: STAR GRAIN LTD                    SELLER: ASTON AGRO-TRADING AD

4